**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| VINCENT C., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSBURY SCHOOL DISTRICT, | : | |
| Defendant. | : | No. 24-06340-PAC |
| | : | |

## <u>MEMORANDUM OPINION</u>

**PAMELA A. CARLOS**                                    **September 2, 2025**
**U.S. MAGISTRATE JUDGE**

      Plaintiff Vincent C. was subjected to unspeakable trauma at the hands of Jerrilynne Derolf, a former teacher's aide at the privately operated Valley Day School ("VDS"). During the 2020-21 school year, Plaintiff, who was then only 14 years-old, was groomed and sexually assaulted by Ms. Derolf until her arrest in July of 2021. Ms. Derolf confessed to her crimes and was released on bail. In August of that same year, Ms. Derolf again made contact with Plaintiff and met with him in secret near a Falls Township Community Park. Police responded to the scene, but as officers approached Ms. Derolf and Plaintiff, she pulled out a handgun, told Vincent to run, and shot herself in the head. Plaintiff was just a short distance away.

      Now, pursuant to the instant lawsuit, Plaintiff seeks to hold his former school district responsible for these horrible events. In his Amended Complaint, Plaintiff alleges that Defendant Pennsbury School District ("Pennsbury") had full knowledge of Ms. Derolf's actions and yet took no steps to protect him from subsequent attacks, thus violating its obligations under Title IX of the Educational Amendments of 1972 ("Title IX"), the Equal Protection Clause of the U.S.

Constitution, Section 504 of the Rehabilitation Act of 1983, and the Americans with Disabilities Act ("ADA").

Pending before the Court now is Pennsbury's Motion to Dismiss the Amended Complaint. *See* Doc. No. 56. For the reasons that follow, Defendant's Motion is **GRANTED** and the lawsuit is dismissed **with prejudice.**

## I. BACKGROUND

### A. Procedural History

On November 26, 2024, Plaintiff Vincent C., together with his grandparents John H. and Tracey H. (the "Grandparent Plaintiffs"), filed suit against VDS and Pennsbury. *See* Doc. No. 1. On February 3, 2025, the Parties consented to jurisdiction before a U.S. Magistrate Judge, and the matter was assigned to the undersigned to conduct all remaining proceedings in the case. *See* Doc. No. 16. On February 5, 2025, Defendant VDS moved to dismiss Plaintiffs' Complaint in its entirety. *See* Doc. No. 19. Two days later, Defendant Pennsbury filed its own motion to dismiss. *See* Doc. Nos. 20 and 23.[1]

In lieu of filing an amended complaint at that time, Plaintiffs filed their Responses to each motion. *See* Doc. Nos. 29 and 30. In each Response, the Grandparent Plaintiffs noted that they agreed to voluntarily withdraw their Loss of Consortium claims. *See* Doc. No. 29 at 38, n. 9 and Doc. No. 30 at 47, n. 13.[2] Plaintiffs otherwise opposed each Motion in its entirety.

Concurrent with briefing related to each motion to dismiss, Plaintiffs filed a Nunc Pro Tunc Consent Motion to Continue to Proceed Anonymously. *See* Doc. No. 31. On March 25, 2025, the

---

[1]    On February 10, 2025, the Court sealed Defendant Pennsbury's motion after observing that it was not appropriately redacted. *See* Doc. No. 21. Defendant Pennsbury refiled its motion on February 11, 2025. *See* Doc. No. 23.

[2]    For Document Numbers 29 and 30, page citations are to the pages listed in the court-stamped header, not at the bottom of the page.

Court granted the motion with respect to Plaintiff Vincent C., but denied the motion with respect to the Grandparent Plaintiffs, who had failed to show that their private interests in anonymity outweighed the public's interest in access to their identities. *See* Doc. No. 35. On March 27, 2025, Plaintiffs filed a Consent Motion to Amend the Case Caption to remove John H. and Tracey H. as Parties to the lawsuit. *See* Doc. No. 36. After consulting with the Parties' counsel, and confirming that the Loss of Consortium Claims were fully withdrawn and that John H. and Tracey H. had no other claims in this case, the Court entered an Order dismissing the Grandparent Plaintiffs from the lawsuit. *See* Doc. No. 40. Vincent C. is the only remaining Plaintiff in this matter.

Several months later, following a telephone conference with counsel for the Parties, the undersigned confirmed Plaintiff had agreed to settle all claims he had against VDS, and an Order was entered on July 9, 2025 dismissing VDS as a defendant and denying VDS' motion to dismiss as moot. *See* Doc. Nos. 48, 49, 50, 51. Plaintiff thereafter moved for leave to file an Amended Complaint, which was granted on July 17, 2025, thereby mooting Pennsbury's pending motion to dismiss. *See* Doc. Nos. 52, 54. On July 28, 2025, Pennsbury renewed its Motion to Dismiss the Amended Complaint. *See* Doc. No. 56. On August 11, 2025, Plaintiff filed his Response brief in opposition, *see* Doc. No. 58, and Pennsbury filed a Reply the next day. *See* Doc. No. 60.[3]

Pennsbury's Motion to Dismiss is fully briefed and is now ripe for disposition.[4]

---

[3]    Page references to Document Numbers 56 and 60 are to those pages listed in the footer of the document, whereas references to Document Number 58 are to the court-stamped pages in the document header.

[4]    Following a Rule 16 conference on February 19, 2025, *see* Doc. No. 26, the Court directed the Parties to engage in fact discovery while the motions to dismiss were pending. *See* Doc. No. 27. The discovery period was set for 180-days, or until August 18, 2025. *See id.*

B.      **The Amended Complaint Allegations**

During the 2020-21 school year, Plaintiff Vincent C. was groomed and sexually assaulted by Jerrilynne Derolf, who was then a teacher's aide at VDS.[5] *See* Doc. No. 55 at ¶ 1. At the time, Plaintiff was just 14 years old. *See id.*[6] Pennsbury[7] placed Plaintiff at VDS because he was a child with an Emotional Disturbance and a history of major trauma. *See id.* at ¶¶ 2, 53-65 (describing, among other things, Plaintiff's extensive history of physical and verbal abuse at the hands of his parents, his history in foster care and homeless shelters, a prior suicide attempt, and Pennsbury's decision to place Plaintiff at VDS). Plaintiff alleges that Pennsbury knew that Plaintiff was repeatedly abandoned by his parents and that Ms. Derolf picked Plaintiff to groom and assault because this abandonment made him extremely vulnerable. *See id.* at ¶ 3. Plaintiff further alleges that Ms. Derolf had access to, and was required to read, his district-issued Individualized Education Program ("IEP"), which noted that Plaintiff used language that was "very sexual and inappropriate for a school setting." *See id.* at ¶¶ 3, 66, 67.

According to Plaintiff, Ms. Derolf "openly groomed" him in the fall of 2020 by using their Zoom classroom on Plaintiff's school-issued computer for long, "private conversations." *See id.* at ¶¶ 4, 68-71 (explaining that the school year began virtually due to the COVID-19 pandemic, that Ms. Derolf would participate in virtual lessons as a teacher's aide, but did not run them, and that Ms. Derolf frequently asked Plaintiff to remain in the Zoom classroom to speak further after everyone logged off). Plaintiff maintains that his teacher "knew or should have known" that he

---

[5]      Plaintiff alleges that VDS "is a private educational setting licensed by the Pennsylvania Department of Education and identified by it as an 'Approved Private School' to provide special education for emotionally disturbed students who cannot be properly and adequately served in a local school district."  *See* Doc. No. 56 at ¶ 63.

[6]      At the time the Complaint was filed, Plaintiff was 17 years old. *See* Doc. No. 1 at ¶ 51. He is now 18.

[7]      Plaintiff alleges that Pennsbury "is a public entity responsible for compliance with the guarantees of Title IX and Title II of the ADA." *See* Doc. No. 56 at ¶ 19.

and Ms. Derolf stayed on-line for extended periods of time after the lesson to talk privately and that this was inappropriate. *See id.* at ¶ 72. Plaintiff alleges that Pennsbury had "a custom, policy, or practice that permitted [Ms.] Derolf to have unsupervised one-on-one conversations with Vincent over Zoom after the lesson ended," and these conversations lasted until about January 2, 2021[8] when students returned to in-person instruction. *See id.* ¶¶ 73-75.

Ms. Derolf continued grooming Plaintiff in the Spring of 2021 by taking him on long walks around the VDS campus, "which she admitted that the other teachers and staff observed and found unusual and troubling." *See id.* at ¶¶ 4, 78-80 (alleging, among other things, that Ms. Derolf told Vincent that at least one unnamed VDS teacher described their walks as "weird"). According to Plaintiff, this too amounted to a "custom, policy, or practice" of Pennsbury. *See id.* at ¶ 81. During this time, Ms. Derolf also encouraged Vincent to download a messaging app on his phone called "Discord," which would delete their text messages after they were sent. *See id.* at ¶ 82. According to Plaintiff, Pennsbury failed to train its employees or agents on how to appropriately communicate with students. *See id.* at ¶ 83. Using this app, Ms. Derolf sent Vincent sexually suggestive and explicit communications. *See id.* at ¶ 87. Ms. Derolf's behavior escalated further, the two began going out to eat, and she ultimately kissed him and introduced him to marijuana. *See id.* ¶¶ 88, 89. She would sometimes drive him home from VDS or to her house to play video games with her children. *See id.* at ¶ 90. According to Plaintiff, Pennsbury had a "custom, policy, or practice of permitting employees or agents to drive students away from school in their private vehicles, unsupervised." *See id.* ¶ 92.

---

[8]     The Amended Complaint alleges that "[t]hese one-on-one conversations on Zoom lasted from about September 2020 until January 2, 2020." *See* Doc. No. 56 at ¶ 74. This latter date appears to be an apparent typo. The next allegation notes that students returned to in-person education on January 2, 2021. *See id.* at ¶ 75.

Then, in early June/July 2021, the grooming and meetings initiated by Ms. Derolf with Plaintiff became romantic in nature, and they had sexual intercourse three times in July 2021—twice in the area of the Levittown Lake in Tullytown Borough and once near a baseball field in Bristol Township *See id.* at ¶¶ 5, 93. During these interactions, Ms. Derolf always carried and displayed a firearm. *See id.* at 94.

On July 13, 2021, police began investigating Ms. Derolf, and just two days later, she confessed to her crimes and was arrested "with extensive region-wide publicity." *See id.* at ¶¶ 6, 95. However, she was released on bail several days later. *See id.* She was charged with several felonies, including Statutory Sexual Assault and Involuntary Deviate Sexual Intercourse. *See id.* at ¶ 96.

Because Ms. Derolf's arrest and bail status was widely reported, Plaintiff maintains that Pennsbury had knowledge of her actions and yet took no meaningful steps as required by several federal laws to address his vulnerabilities. *See id.* at ¶¶ 98, 99. Plaintiff alleges that no steps were taken to reevaluate his disability-status, to increase his immediate emotional needs, or to modify his IEP, notwithstanding the "extraordinarily time-sensitive situation." *See id.* at ¶ 100. Plaintiff also maintains that Pennsbury failed to take the immediate investigative and remedial steps required by Title IX, and several other federal statutes including Section 504 of the Rehabilitation Act of 1983 and the ADA. *See id.* at ¶¶ 103, 120, 121, 123.

Once released on bail, Ms. Derolf immediately began contacting Plaintiff via his cell phone to meet with him secretly. *See id.* at ¶ 106. On August 22, 2021, based on information from a neighbor, Plaintiff's family contacted the Falls Township Police and reported that Plaintiff might meet with Ms. Derolf near the area of Old Bristol Pike and Wheatsheaf Lane. *See id.* at ¶ 107. As

the police approached Ms. Derolf and Vincent, she pulled out a handgun, told Vincent to run, and quickly shot herself to death as Vincent ran a short distance away. *See id*. at ¶ 108.

According to Plaintiff, Ms. Derolf's criminal acts were the direct result of Pennsbury's failure to adequately train, supervise, monitor, and oversee its agents and employees, its repeated failures to provide within Vincent's educational plans adequate direct instruction, therapeutic programming, and skill development to self-advocate and recognize improper and criminal sexual advances upon him, and Pennsbury's failure to provide appropriate family training for Vincent's caretakers. *See* ¶ at 124. As such, Plaintiff brings six claims:

- Count I, Deliberate indifference to sex-based discrimination in violation of Title IX;

- Count II, Section 1983 claim for enforcement of Title IX;

- Count III, Section 1983 claim for enforcement of the Equal Protection Clause;

- Count IV, Discrimination and denial of benefits under Section 504;

- Count V, Discrimination and denial of benefits under the ADA; and

- Count VI, Section 1983 claim for enforcement of the ADA.

## II.    STANDARD OF REVIEW

Pennsbury has moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure for a complete dismissal of Plaintiff's claims. *See* Doc. No. 56. On review of a 12(b)(6) motion to dismiss, the reviewing court "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). To withstand a motion to dismiss, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint need not have "detailed factual allegations," but it "requires more than labels and conclusions," *Id.* (citation omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8's pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation.") (citations omitted). In ruling on a Rule 12(b)(6) motion, the court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *See Mayer*, 605 F.3d at 230 (citation omitted).

III.    DISCUSSION

A.    **Plaintiff failed to state a claim for relief under Section 1983.**

At Counts II, III, and VI of the Amended Complaint, Plaintiff brings three Section 1983 claims against Pennsbury seeking enforcement of Title IX, the Equal Protection Clause of the U.S. Constitution, and the ADA, respectively. *See* Doc. No. 55 at ¶¶ 38-43, 44-48, 140-148, 149-156, 185-195. Municipal defendants, like Pennsbury, can be held liable under Section 1983 for its own illegal acts, "but not the wrongful acts of its employees or agents." *Thompson v. Se. Pennsylvania Transportation Auth.*, No. 21-2286, 2022 WL 17958629, at *3 (3d Cir. Dec. 27, 2022) (citing *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 691 (1978)). "Because [Section] 1983 does not allow vicarious liability, 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Jones v. Unknown D.O.C. Bus Driver & Transportation Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 676). "In this regard, a [Section] 1983 claim against a municipality may proceed in two ways." *Thompson*, 2022 WL 17958629 at *3 (citing *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)). The plaintiff may allege "that an unconstitutional policy or custom of the municipality led to his or her injuries," or that the injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Id.* (citing *Forrest*, 930 F.3d at 105).[9]

Under a policy theory, "a plaintiff must (1) identify the challenged policy, (2) attribute it to the entity, and (3) show a causal connection between the execution of that policy and the injury

---

[9]    Plaintiff maintains that VDS operated as Pennsbury's "agent," and therefore, its actions (or inaction) can be attributed to Pennsbury for liability purposes. However, even if Plaintiff adequately pled facts to support an agency relationship between Pennsbury and VDS, more is necessary to state a Section 1983 claim. *Monell*, 436 U.S. at 694 (holding that a municipal defendant "may not be sued under Section 1983 for an injury inflicted solely by its employees or *agents*.") (emphasis added). In other words, even if VDS operated as Pennsbury's "agent," Pennsbury cannot be held liable under Section 1983 based solely on the actions of VDS and its employees, like Ms. Derolf.

suffered." *See id.* (citing *Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 51 (3d Cir. 1985)). Policy decisions are made by those individuals who possess "final authority" to establish municipal policy and the issuance of an official proclamation, policy, or edict with respect to the disputed action. *See Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). Custom, by contrast, "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *See id.* (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For Section 1983 purposes, a custom "must have the force of law by virtue of the persistent practices of state officials." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970).

For a claim predicated on a failure or inadequacy theory, plaintiffs must plead "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest,* 930 F.3d at 105 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). For such claims, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citations omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*; *see also Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 199 (3d Cir. 2018) ("In order for a failure-to-train claim to support *Monell* liability, a plaintiff must show 'that in light of the duties assigned to [the relevant employees,] the need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'") (citation omitted).

In the instant suit, Plaintiff broadly alleges that Pennsbury maintained several unlawful customs and/or policies by: (a) allowing aides to have unsupervised, one-on-one interactions with students, even those such as Plaintiff who was particularly vulnerable to sexual grooming, discrimination, and abuse; (b) permitting employees and agents, such as aides, to drive students away from campus, unsupervised; (c) failing to train its employees on how to identify, report, investigate, and/or quell sex-based discrimination; and/or (d) refusing to implement mandatory Title IX protections such as grievance processes, investigations, and supportive and corrective measures. *See* Doc. No. 55 at ¶¶ 73, 92, 153. But these allegations fall far short of what is required to plead *Monell* liability.

To begin, Plaintiff failed to allege who—if anyone—from Pennsbury established these policies. He does not, for example, allege that a Pennsbury administrator, or any other employee, served as a "final decisionmaker" for the now-disputed actions. Therefore, any Section 1983 claim predicated on an unconstitutional "policy" fails as a matter of law. *See Thompson*, 2022 WL 17958629, at *3 ("[Appellant] fails to allege a 'policy' under *Monell* because he fails to identify a final decisionmaker responsible for such a policy.").[10]

Plaintiff also fails to allege that Pennsbury maintained a "custom" that was "so well-settled and permanent as virtually to constitute law." *Est. of Roman*, 914 F.3d at 798 (cleaned up). At best, Plaintiff's allegations show an *individual* pattern of harassment committed by *one* rogue individual.[11] *See Thompson*, 2022 WL 17958629, at *4 (affirming decision to dismiss plaintiff's

---

[10]    The Amended Complaint also fails to identify anyone from VDS who served as a "final decisionmaker" for any of the alleged unlawful policies.

[11]    In the instant case, this individual—Ms. Derolf—was not a Pennsbury employee.

Section 1983 claim predicated on an unlawful custom because the allegations show, at best, an individual act of discrimination). The Complaint makes clear that Ms. Derolf—and only Ms. Derolf—engaged in behaviors that Plaintiff now characterizes as "customs." Only Ms. Derolf, and no other person, (a) privately met with VDS students after their Zoom classes were completed; (b) privately walked with VDS students around campus; (c) privately communicated with VDS students via Discord, or other social media applications; or (d) drove VDS students home after the school-day ended. In fact, elsewhere in his Amended Complaint, Plaintiff alleges that other teachers and staff employed by VDS—not by Pennsbury—characterized Ms. Derolf's actions as "unusual," "troubling" and "weird"—not that they were consistent with any well-settled and permanent custom. *See* Doc. No. 55 at ¶¶ 4, 79, 80.

For similar reasons, any claim predicated on a failure to train, or other inadequacy theory, also fails. Plaintiff alleges that Pennsbury failed to adequately train, supervise, and oversee its agents/employees and Vincent's caretakers, and this failure directly caused his harm. *See id.* at ¶¶ 124, 153. But the U.S. Supreme Court has made clear that a "failure to train" or "failure to supervise" claim under Section 1983 is available only in "limited circumstances." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Here, Plaintiff does not allege a pattern of prior violations. Indeed, he does not allege that *any other* student at VDS, or at any other school, was subjected to similar conduct, or that other students, parents, or guardians ever previously complained to VDS or Pennsbury about inappropriate teacher/staff behavior. Without these, or other allegations, Plaintiff has not sufficiently pled that Pennsbury should have been "on notice" that its existing training or supervisory programs were inadequate, or that its failure to train/supervise evidences "deliberate indifference" to likely constitutional violations. *See, e.g., Hadidi v. City of Shamokin,* No. 4:22-CV-00066, 2023 WL 11983217, at *12 (M.D. Pa. Jan. 11,

2023), *report and recommendation adopted*, No. 4:22-CV-66, 2023 WL 11983215 (M.D. Pa. Apr. 17, 2023) ("To show deliberate indifference, a plaintiff usually must show a 'pattern of similar constitutional violations by untrained employees.'") (quoting *Connick*, 563 U.S. at 62); *Loomis v. Montrose Borough Police Dep't*, No. 3:20-CV-1610, 2021 WL 2865290, at *4 (M.D. Pa. July 8, 2021) (dismissing plaintiff's *Monell* claim where she did not identify "a single instance" other than the events giving rise to her harm, to support her failure to train/supervise claim).[12]

In short, the Amended Complaint does not plead facts sufficient to establish *Monell* liability against Pennsbury, and Counts II, III, and VI are dismissed.[13]

---

[12]    Plaintiff does not allege or argue that this "single incident" of misconduct may evidence deliberate indifference sufficient to establish *Monell* liability. However, the Court recognizes that "in certain situations, the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights' even without a pattern of constitutional violations." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quotations and committed omitted). "Such 'single-incident' liability turns on '[t]he likelihood that the situation will recur and the predictability that an [employee] lacking specific tools to handle the situation will violate citizens' rights.'" *Rothermel v. Dauphin Cnty., Pennsylvania*, No. 1:16-CV-1669, 2020 WL 1467267, at *10 (M.D. Pa. Mar. 26, 2020), *aff'd*, 861 F. App'x 498 (3d Cir. 2021) (citing *Thomas*, 749, F.3d at 223-24). In other words, the plaintiff must show "that the risk of the claimed constitutional injury was a 'highly predictable consequence' of the challenged policy." *See id.* (quoting *Connick*, 563 U.S. at 63-64).

The Amended Complaint can arguably be construed to encompass such a claim—one where Plaintiff alleges that because Ms. Derolf's behavior amounted to "obvious" grooming/harassment, Pennsbury's failure to train its agents on how to identify, report, investigate, or quell sex-based discrimination enabled Ms. Derolf's criminal acts. But this does not salvage his claim. The U.S. Supreme Court emphasized that "single incident" cases are viable only in "a narrow range of circumstances" involving "recurring situations" with a "high degree of predictability" that harm will result in the absence of adequate training. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). Plaintiff does not allege any of the complained-of actions were frequent occurrences, or are likely to recur. Rather, Plaintiff repeatedly alleges that he was *uniquely* susceptible to harm. For example, Plaintiff alleges that Ms. Derolf picked him "to groom and sexually assault" because he was frequently abandoned by his parents and this "made him extremely vulnerable." *See* Doc. No. 55 at ¶ 3. Elsewhere in the Amended Complaint, he emphasized that as a previous victim of abuse, he was the vulnerable type of child who is frequently targeted for sexual abuse by trusted adults. *See id.* at ¶ 54. In other words, Plaintiff's unique vulnerability undercuts any suggestion that this situation was so likely to recur that Pennsbury (or VDS, for that matter) was "deliberately indifferent" to the need for specific training/supervisory programs.

[13]    The Parties' briefing discusses several issues that the Court need not resolve here. For example, Plaintiff maintains that under the Supreme Court's framework annunciated in *Health & Hospital Corporation of Marion County v. Talevski,* 599 U.S. 166 (2023) he may use Section 1983 to enforce both Title IX and the ADA against Pennsbury, *see* Doc. No. 58 at 16-23, whereas the District argues that Plaintiff's attempts to use Section 1983 in this manner has not been adopted by the Supreme Court, *see* Doc. No. 60 at 3-4, and is barred by the "*Seaclammers Doctrine.*" *See* Doc. No. 56 at 6-7. Pennsbury also argues that Plaintiff's Section 1983 claim to enforce the Equal Protection Clause fails as a matter of law because he failed to identify any comparator students that were treated differently than he was in order to establish disparate treatment based upon his sex, *see id.* at 7-9, whereas Plaintiff responds that he is not required to plead "comparators" to state a claim for relief. *See* Doc. No. 58 at 24.

### B.    Plaintiff failed to state a claim of deliberate indifference to sex-based discrimination in violation of Title IX.

It is well established that sexual harassment is a form of Title IX discrimination. *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999). To state such a claim, plaintiffs must establish the following:

> (1) the defendant receives federal funds; (2) sexual [or racial] harassment occurred; (3) the harassment occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]," (4) the funding recipient had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school.

*Williams v. Pennridge Sch. Dist.*, No. CV 15-4163, 2018 WL 6413314, at *6 (E.D. Pa. Dec. 6, 2018), *aff'd*, 782 F. App'x 120 (3d Cir. 2019) (citing *Davis*, 526 U.S. at 644-45, 650).

There is no dispute that a school district can be held liable under Title IX in cases "involving a teacher's sexual harassment of a student," such as the one presented here. *Davis ex rel. LaShonda D.*, 526 U.S. at 649–50 (*citing Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)). However, the U.S. Supreme Court has made clear that "a student seeking to recover damages from a school district for a teacher's misconduct must demonstrate that an official of the district with the 'authority to institute corrective measures on the district's behalf' had 'actual notice' of the prohibited discrimination, and that the official was 'deliberately indifferent' to the

---

The Court takes no position on these arguments. As explained at length above, municipal defendants, like Pennsbury cannot be held liable solely for the wrongful acts of its employees or its agents. *See Thompson*, 2022 WL 17958629, at *3. Even if Plaintiff is correct that in *Talevski*, the Supreme Court expanded a plaintiff's use of Section 1983 to enforce Title IX and other federal statutes, he must still plead facts demonstrating that the municipal defendant's *own* actions through its policies and well-settled customs caused the alleged harm. In this regard, Plaintiff's Amended Complaint falls short of what is required to establish *Monell* liability.

district's obligations." *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 343 (W.D. Pa. 2011) (*citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)).

In this regard, "actual knowledge does not require absolute certainty that harassment has occurred," but it "must be more than an awareness of a mere possibility of the harassment." *Bernard v. E. Stroudsburg Univ.*, No. 3:09-CV-00525, 2014 WL 1454913, at *16 (M.D. Pa. Apr. 14, 2014), *aff'd*, 700 F. App'x 159 (3d Cir. 2017) (citing *Bostic v. Smyrna School Dist.*, 418 F.3d 355, 360 (3d Cir. 2005)). Once actual notice has been established, the plaintiff must demonstrate that the district official was "deliberately indifferent" to the harassment, which is "an exacting standard requiring that the official disregard a known or obvious consequence of his action or inaction." *Id.* Crucially, this official—who is often referred to as an "appropriate person" for Title IX purposes—must at a minimum have the authority to take corrective action to end the discrimination. *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, No. CV 3:19-1146, 2024 WL 4340718, at *4 (M.D. Pa. Sept. 27, 2024), *amended on reconsideration*, No. CV 3:19-1146, 2024 WL 4351903 (M.D. Pa. Sept. 30, 2024); *see, e.g., Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 171 (3d Cir. 2002) ("[A] school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX.").

Pennsbury emphasizes that the Amended Complaint allegations make clear that Plaintiff's injuries occurred outside of the District's "zone of interest," i.e., the injuries occurred under circumstances in which Pennsbury lacked control over Ms. Derolf, and under circumstances in which Pennsbury lacked control over the context in which the abuse occurred. *See* Doc. No. 56 at 5-6. As Pennsbury argues, "according to Plaintiff's pleading, [Ms.] Derolf was a Valley Day School employee, not a District employee," and so the District "did not have access to her for

investigation of her whereabouts or behaviors, could not control her whereabouts or behaviors and could not discipline her for potential violations of any such controls." *See id.* at 6.

Plaintiff opposes the motion first by arguing that Pennsbury's position presents nothing more than factual assertions, which are inappropriate at the motion to dismiss stage. *See* Doc. No. 58 at 9-13. Plaintiff also argues that contrary to Pennsbury's contention, he was not "returning" to the District in the fall, "he was *always* a student of the District, under IEPs created by the District," and therefore, Pennsbury "had an affirmative duty to provide him an appropriate education during the 2020-21 school year and in the summer of 2021." *See id.* at 10-11 (emphasis in original). He argues further that when Pennsbury placed him at a private school pursuant to a District-issued IEP, he "unquestionably remain[ed] a student of the district which ha[d] a non-delegable mandate to meet that child's needs." *See id.* at 11. In other words, Plaintiff insists that he always was within the District's "zone of interest" for purposes of Title IX, and any argument to the contrary is misplaced.

Plaintiff further rejects the District's claim that he is attempting to attribute Title IX liability to the District solely through the doctrine of agency. *See id.* at 13. According to Plaintiff, "[i]t is abundantly clear throughout the Amended Complaint that the Plaintiff is not attempting to hold the District liable only through agency, but rather alleging liability based on the District's own failure to respond to known acts of sexual abuse of one of its students." *See id.* In this regard, Plaintiff points to specific allegations in which he notes that Ms. Derolf confessed to her crimes with extensive region-wide publicity, that Pennsbury was aware of the arrest, and that it still failed to take any action to assist and support Vincent, or to prevent further contact and abuse by Ms. Derolf. *See id.* (citing Doc. No. 55 at ¶¶ 6-8). In short, Plaintiff maintains that he was groomed by Ms. Derolf on school grounds or during Zoom lessons for an entire school year, and the District is

alleged to have known about the grooming as well as the abuse at least as of the day of her arrest on July 15, 2021. *See id.* at 15.

Plaintiff's response is unconvincing. To begin, Plaintiff alleges that he was "openly groomed," by Ms. Derolf over the span of several months and that Pennsbury knew about this conduct. *See* Doc. No. at 55 at ¶ 4. However, his numerous and detailed examples assert a different story and demonstrate that Ms. Derolf targeted him in "private." Plaintiff alleges that Ms. Derolf often asked him to stay on-line after class to speak further using VDS's Zoom platform. *See id.* at ¶¶ 70-72. Plaintiff also alleges that Ms. Derolf took him on long walks around VDS's campus, which he contends was unusual, and that Ms. Derolf sometimes drove him home from school or to her house to play video games with her children. *See id.* at ¶¶ 4, 78, 90. But he does not allege that anyone else at VDS—or Pennsbury for that matter—participated in these private Zoom meetings or walks. He also does not allege that he—or any other student, parent, teacher, or other employee—reported these behaviors to either a VDS or Pennsbury official, let alone an official with authority to take corrective measures on behalf of either entity. Instead, the Complaint allegations make clear that these were consistently "private conversations." *See id.* at ¶ 4.[14]

At best, Plaintiff suggests that some unnamed teachers at VDS—not any Pennsbury employee or administrator—"knew or should have known" about the private Zoom conversations, and that at least one VDS teacher (again, unnamed) described their walks around campus as "weird." *See id.* at ¶¶ 72, 80. But this falls short of the pleading requirements to state a Title IX claim. As an initial matter, Plaintiff does not allege that these teachers were Pennsbury employees,

---

[14] Plaintiff also alleges that Ms. Derolf sent him sexually explicit messages via an app called "Discord." *See* Doc. No. 56 at ¶ 87. Again, Plaintiff does not allege that *anyone* else knew about these messages. He does not allege that he told his grandparents, classmates, or other VDS or Pennsbury employees that he was using this app to communicate with Ms. Derolf, or that Ms. Derolf was sending him inappropriate content. In fact, Plaintiff made clear that this app deleted the messages after they were sent, which only emphasizes their clandestine nature. *See id.* at ¶ 82.

or that these teachers ever interacted with any other Pennsbury official. Nor does he allege that these unnamed individuals even suspected that Ms. Derolf was harassing Plaintiff, let alone that they had "actual knowledge" of any inappropriate conduct. *See Bostic*, 418 F.3d at 361 (explaining that the U.S. Supreme Court expressly rejected principles of "constructive notice" and *respondeat superior* to permit recovery under Title IX, and therefore, "actual notice" must be based on more than just a "possibility"); *see also Bernard,* 2014 WL 1454913, at *16 (explaining that actual knowledge for purposes of Title IX requires "more than an awareness of a mere possibility of the harassment."); *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 614 (E.D. Pa. 2014) (dismissing Title IX claim against the higher education institution because plaintiff did not allege that she notified the institution of any harassment during the relevant time period, and did not allege facts sufficient to demonstrate the institution had "actual knowledge" of known acts of sexual harassment). And crucially, even if these teachers had such knowledge, Plaintiff does not allege any facts demonstrating that they themselves had any authority to take corrective action, or that they took any steps to notify someone at Pennsbury who had such authority. Indeed, Plaintiff does not allege that these teachers ever notified anyone at VDS who had the requisite authority to take action.

To salvage his claim, Plaintiff emphasizes that Ms. Derolf was arrested in July 2021, "with extensive region-wide publicity," and argues that from this, Pennsbury had knowledge of the harm done. *See* Doc. No. 55 at ¶¶ 6, 97. Indeed, in his Response, Plaintiff notes that with the benefit of discovery, it is apparent that the District was aware of Ms. Derolf's arrest for the abuse of Vincent as early as July 15, 2021, noting that the District's own witness, Peter Carfagno testified as to this fact. *See* Doc. No. 58 at 15. And despite this knowledge, Plaintiff insists that the District took no steps to protect him from further harassment, as is required under Title IX.

But there are several problems with Plaintiff's Response. To begin, the Amended Complaint does not describe who Mr. Carfagno is, what position he held for the District, and what he knew (and did not know) about Ms. Derolf and her alleged crimes against Vincent. In fact, Mr. Carfagno is not identified at all in the Amended Complaint. But *even if* Mr. Carfagno, or any other District employee, learned of the abuse following Ms. Derolf's arrest, Plaintiff does not plead facts demonstrating that the District had substantial control over either Ms. Derolf, or the manner in which the post-arrest harassment occurred. "Repeatedly, courts have found that harassment that takes place off of school grounds and/or outside of school hours does not occur under circumstances where the District exercised substantial control over either the harasser or the context in which the harassment occurred." *Williams,* 2018 WL 6413314, at *7 (collecting citations). In this regard, Pennsbury explained that "each time [Plaintiff] met with Ms. Derolf for unlawful and abusive purposes, they met off site from the Defendant District's premises." *See* Doc. No. 56 at 5 (citations omitted). Plaintiff did not allege that Pennsbury continued to exercise any control over Ms. Derolf, who had just recently been in state custody and who was no longer reporting to VDS in any capacity.[15] Plaintiff also did not allege that Pennsbury exercised substantial control over the manner in which the later harassment occurred. Plaintiff did not allege that Ms. Derolf contacted him using district-issued equipment or that she met with him on or even near Pennsbury property. To the contrary, the Amended Complaint allegations repeatedly emphasize the secretive nature of Ms. Derolf's actions, all of which occurred under circumstances that Pennsbury could not possibly control.

---

[15]    Indeed, the Amended Complaint does not allege that Ms. Derolf *ever* communicated with a Pennsbury official, or any additional facts that would support the claim that Pennsbury had any authority to train, monitor, or otherwise exercise control over Ms. Derolf, who was a VDS employee.

In short, the Amended Complaint allegations demonstrate that Plaintiff was subjected to unspeakable and criminal misconduct at the hands of Ms. Derolf. But even accepting these allegations as true, Plaintiff has not alleged facts demonstrating that an appropriate person at Pennsbury had "actual notice" of the harassment until after Ms. Derolf was arrested. Nor has he alleged facts demonstrating that Pennsbury exercised "substantial control" over Ms. Derolf following her arrest, or had any control over the manner in which the post-arrest harassment took place. As such, Plaintiff failed to state a claim for relief under Title IX against Pennsbury.

### C. Plaintiff failed to state claims for relief under Section 504 of the Rehabilitation Act and the ADA.

At Counts IV and V, Plaintiff alleges that he was deprived of the equal benefits of his educational program, and was otherwise subject to discrimination, because of his disabilities, and therefore, Pennsbury violated his rights under Section 504 of the Rehabilitation Act and Title II of the ADA. *See* Doc. No. 55 at ¶¶ 157-184. Because the same standards govern both claims, the Court will analyze each using the same framework. *See Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (citing *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." (citation omitted)). Section 504 provides as follows:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..."

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013) (citing 29 U.S.C. § 794(a)). The ADA similarly states:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*Id.* (citing 42 U.S.C. § 12132). To state a claim under either statute, a plaintiff must plead that he: (1) has a disability; (2) was otherwise qualified to participate in the school program at issue; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of the disability. *See Chambers ex rel. Chambers.*, 587 F.3d at 189 (3d Cir. 2009) (citing *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991) (citation omitted).[16]

The Amended Complaint describes two distinct timeframes—first, the period in which Ms. Derolf groomed and harassed Plaintiff due to his disability while enrolled at VDS; and second, the period following Ms. Derolf's arrest and the District's alleged failure to respond. As to this first timeframe, the Amended Complaint explicitly alleges that Ms. Derolf targeted Plaintiff because she was aware of his unique emotional needs—i.e. "because of" his disability. For example, Plaintiff alleges that "[Ms.] Derolf picked Vincent to groom and sexually assault because [his] abandonment made him extremely vulnerable and because she had access to—and was required to read—his School District issued IEP [] which stated that his disability-related needs included that 'the language he uses is very sexual and inappropriate for a school setting.'" *See* Doc. No. 55 at ¶ 3; *see also id.* at ¶¶54 (observing that as a prior victim of abuse, he is the type of child who is frequently targeted for recurrent abuse), 66-67 (observing that his disability-related records noted the sexualized language he uses and his prior experiences with assault). In other words, Plaintiff plainly alleges that he "was otherwise subject to discrimination"—in this case, targeted by Ms. Derolf for harassment—because of his disability.

However, as Pennsbury repeatedly emphasizes in its Motion, Ms. Derolf was a VDS employee—*not* a District employee. *See* Doc. No. 56 at 6, 8. And for his part, Plaintiff

---

[16]     The Rehabilitation Act additionally requires that the program at issue receives federal financial assistance. However, at this juncture, there is no dispute that this element applies to the District.

acknowledges as much. *See* Doc. No. 55 at ¶ 1 (noting that Ms. Derolf was a teacher's aide at VDS). Recognizing this, Plaintiff consistently alleges that VDS operated as the District's "agent" for purposes of administering his education. *See id.* at ¶¶ 2, 20, 65, 104, 128.

Therefore, the crucial question as to this first timeframe is whether Pennsbury can be held vicariously liable under Title II of the ADA and Section 504 of the Rehabilitation Act for the actions of its agent, VDS, who itself would be liable for the actions of its employee, Ms. Derolf. Neither the U.S. Supreme Court, nor our court of appeals, has directly addressed this issue and held that a public entity can be held vicariously liable under Title II of the ADA or Section 504 for money damages for the conduct of its employees or its agents. And notably, our sister courts of appeals are divided. *Compare Ingram v. Kubik,* 30 F.4th 1241, 1259 (11th Cir. 2022) and *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119 (6th Cir. 2021) (both holding that vicarious liability is not available for the actions of employees or agents) with *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001), *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574–75 (5th Cir. 2002), and *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154, 157 (4th Cir. 1997) (holding that a municipality may be held vicariously liable for the actions of its employees or agents).

In this regard, the Sixth Circuit's analysis in *Jones* is persuasive. "When it comes to remedies for a violation, Title II [of the ADA] borrows from the Rehabilitation Act. It says that the 'remedies, procedures, and rights' under section 505 of the Rehabilitation Act apply to Title II claims." *Jones*, 20 F.4th at 1119. The court further explained that the Rehabilitation Act itself borrows from Title VI of the 1964 Civil Rights Act. *See id.* The Sixth Circuit continued, "Title II of the ADA is not the only federal civil rights statute that incorporates the remedies established by Title VI of the Civil Rights Act." *See id.* at 1120. In fact, "Title IX of the Education Amendments

of 1972 uses the same remedial scheme," and the U.S. Supreme Court has "already investigated the availability of vicarious liability under Title IX." *See id.* (citations omitted). More specifically, the U.S. Supreme Court in *Gebser* held that a student who had a relationship with her teacher could not sue her school district for sexual harassment under Title IX because there was no evidence that other school officials knew about the teacher's misconduct. *See id.* (citing *Gebser*, 524 U.S. at 277-78, 291). The Sixth Circuit explained further, "[w]hat was true for Title IX in *Gebser* is true for Title VI today," and several other circuits agree that an entity cannot be held vicariously liable on a *respondeat superior* theory under Title VI. *See id.* at 1121 (citing *United States v. County of Maricopa*, 889 F.3d 648, 652 & n.2 (9th Cir. 2018); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam)). Given this, the Sixth Circuit held, "[b]ecause Title II of the ADA and the Rehabilitation Act import Title VI's remedial regime, that ends the inquiry. If Title VI does not allow vicarious liability, neither do these provisions of the ADA or the Rehabilitation Act." *See id.*

Although the Third Circuit has not explicitly reached the same conclusion concerning vicarious liability, it has noted the interconnected relationship between the ADA, the Rehabilitation Act, Title IV, and Title IX. Our court of appeals explained as follows:

> Section 203 of the ADA states that the remedies available under § 202 of the ADA are the same remedies available under § 505 of the [Rehabilitation Act]. Similarly, § 505 of the [Rehabilitation Act] clearly states that the remedies available under § 504 of the [Rehabilitation Act] shall be the same remedies available under Title VI of the Civil Rights Act of 1964. Based on this statutory language, the Supreme Court has observed that, "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action under Title VI of the Civil Rights Act of 1964." *Barnes v. Gorman,* 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Plainly, therefore, Supreme Court precedent construing Title VI governs enforcement of the [Rehabilitation Act] and the ADA as well. *See Meagley v. City of Little Rock,* 639 F.3d 384, 389 (8th Cir. 2011) ("The ADA was modeled on the Rehabilitation Act, which had been modeled after Title VI, so it follows rationally that the rights and remedies afforded under both statutes should be governed by Title VI precedent.")

*S.H. ex rel. Durrell.*, 729 F.3d at 260–61. Given this, the Third Circuit held that compensatory damages are *not* available under Section 504 of the Rehabilitation Act and Section 202 of the ADA absent a showing of intentional discrimination. *See id.* at 261. More specifically, the court explained that "intentional discrimination" in this regard requires a showing of "deliberate indifference." *See id.* at 264.  To demonstrate deliberate indifference, a plaintiff must plead: (1) that the defendant had knowledge that a federally protected right is substantially likely to be violated; and (2) that the defendant failed to act despite that knowledge. *See id.* at 265. The plaintiff need not plead that the defendant had personal ill will or animosity toward the disabled person. *See id.* at 263. "However, 'deliberate indifference must be a 'deliberate choice, rather than negligence or bureaucratic inaction.'" *Id.* (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009)).

Given all this, the Court today concludes that Pennsbury cannot be held vicariously liable for the actions of its agent under Title II of the ADA and Section 504 of the Rehabilitation Act. [17]

---

[17]    To be sure, the Sixth Circuit in *Jones* acknowledged that at least the Fifth and Ninth circuits have reached the opposite conclusion. *See Jones*, 20 F. 4th at 1121 (citing *Delano-Pyle*, 302 F.3d 574–75; *Duvall*, 260 F.3d at 1141. But the court noted that "time and circumstances have not favored either decision." *See id.* The court explained that the Fifth Circuit decision in *Delano-Pyle* did not engage with *Gebser*, and the court itself acknowledged in two more recent non-precedential decisions that *Delano-Pyle* may have been wrongly decided given this omission. *See id.* (citing *Harrison v. Klein Ind. Sch. Dist.*, 856 F. App'x 480, 483 n.4 (5th Cir. 2021) (per curiam); *Plains Cap. Bank v. Keller Ind. Sch. Dist.*, 746 F. App'x 355, 361–62 (5th Cir. 2018) (per curiam)). The Ninth Circuit in *Duvall* also failed to grapple with *Gebser* and its application to the ADA and Rehabilitation Act. However, it too has more recently held that Title VI does not impose vicarious liability, even if it has not yet taken the logical next step of holding the same for the ADA given the ADA's incorporation of Title IV. *See id.* (citing *County of Maricopa*, 889 F.3d at 652 & n.2). Furthermore, since *Jones* was decided, the Eleventh Circuit cited to it favorably and reached the same conclusion. *Ingram*, 30 F.4th at 1247-1259 ("Under Title II, vicarious liability is unavailable; instead, the 'narrower approach [in *Gebser*] ... requires the deliberate indifference of an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf.").

The undersigned further acknowledges that several district courts in this circuit have suggested that Title II of the ADA and Section 504 of the Rehabilitation Act may provide for vicarious liability. *Geness v. Pennsylvania*, 503 F. Supp. 3d 318, 339 (W.D. Pa. 2020); *Guynup v. Lancaster Cnty.*, No. CIV.A. 06-4315, 2008 WL 4771852, at *1 (E.D. Pa. Oct. 29, 2008) ("Title II of the ADA and Section 504 of the Rehabilitation Act provide for vicarious liability…"); *Zimmerman v. Berdanie*r, No. 07-818, 2008 WL 11503557, at *6 n.10 (M.D. Pa. Jan. 25, 2008). However, the district court decisions in *Guynup* and *Zimmerman* did not cite to *Gebser*, let alone grapple with its possible application to their case. And in *Geness*, the district court explicitly stated, "[w]e need not decide which approach is correct because under either a *respondeat superior* theory or under *Gebser*, we may hold the

As explained at length above, Plaintiff's numerous and detailed pleadings concerning Ms. Derolf's harassment during this timeframe demonstrate that he was subjected to unspeakable misconduct. But this conduct largely occurred in "private." *See supra* at 16-18. He does not allege that any other VDS employee or Pennsbury official participated in the alleged wrongdoing, or otherwise learned of Ms. Derolf's actions through some other means. Moreover, he does not allege that he, or any other student, parent, teacher, or employee, reported Ms. Derolf's actions to VDS and/or Pennsbury officials, let alone any one with the authority to take remedial action to address the wrongdoing. As such, the Court holds that Plaintiff has failed to state a claim of relief under either statute for the timeframe predating Ms. Derolf's arrest.[18]

The period of time following Ms. Derolf's arrest requires further examination. At several points in his Response brief, Plaintiff insists that he is not suing the "agent abuser"—i.e., Ms. Derolf or VDS—but rather the "School District for its complete failure to respond to the sexual abuse of one of its students." *See* Doc. No. 58 at 13. As it concerns his specific claims under Section 504 and the ADA, he argues that the District knew that he was a disabled child, and yet it did nothing to support him after Ms. Derolf's arrest and release on bail. *See id.* at 34-35. More specifically, he argues that the District "took no action to prevent further contact and abuse by [Ms.] Derolf or to put any additional supports or services into effect for Vincent, as required by Section 504 and the ADA." *See id.* at 35.

---

Commonwealth liable" for the conduct of its judges given the record evidence and the Commonwealth's concessions. *See Geness*, 503 F. Supp. 3d at 340. Therefore, the undersigned does not find these cases to be persuasive.

[18]    The Court reaches this conclusion without deciding that Plaintiff has adequately pled an "agency relationship" between Pennsbury and VDS, and its employees. Rather, the Court concludes that *even if* VDS operated as Pennsbury's agent, Plaintiff's claim still fails as a matter of law because Pennsbury cannot be held vicariously liable under Title II of the ADA and Section 504 of the Rehabilitation Act solely for the misconduct of its employees or agents.

In assessing Plaintiff's claims, it is helpful to consider the timeline set forth in the Amended Complaint allegations. The last day of instruction at VDS was June 11, 2021. *See* Doc. No. 55 at ¶ 86. Plaintiff thereafter enrolled in Pennsbury's Extended School Year ("ESY") program on July 6, 2021. *See id.* Based on information from Plaintiff's caretakers—not on any information or suspected concern of any Pennsbury official—the police began investigating Ms. Derolf on July 13, 2021. *See id.* at ¶ 95. Two days later, Ms. Derolf confessed to her crimes. *See id.* On July 23, 2021, Ms. Derolf posted bail and was released from state custody. Because this was "extensively reported," Plaintiff alleges that Pennsbury knew about Ms. Derolf's arrest and her crimes. *See id.* at ¶¶ 95, 97, 105. Yet, despite this knowledge, and despite Plaintiff's educational needs, Plaintiff alleges that Pennsbury took no remedial steps, leaving him "completely vulnerable to continued contact, grooming, sexual assault, and trauma at the hands of [Ms.] Derolf." *See id. at* ¶ 99. At some point during her release, Ms. Derolf "immediately again began to connect with Vincent via his cell phone and to meet with him secretly." *See id.* at ¶¶ 106-107. Pennsbury's ESY program ended on August 5, 2021. *See id.* at ¶ 86. A few weeks after the end of the ESY program, on August 22, 2021, Ms. Derolf met with Plaintiff in secret, and took her life in his presence as police responded to the scene. *See id.* at ¶¶ 106-107. In short, the gravamen of Plaintiff's allegations is that once Pennsbury learned that one of its students was abused, it took no actions to protect him from further abuse, even when time was of the essence.

But this is insufficient to state a claim for relief for several reasons. First, even if the District learned of Ms. Derolf's conduct following her arrest, the Amended Complaint allegations do not demonstrate that its alleged failure to revisit his IEP or provide additional supports in the remaining three weeks of the ESY program constituted a "deliberate choice" by the District. At best, the District's failure to act amounted to negligence or bureaucratic inaction, which our court of appeals

has held is insufficient to demonstrate intentional discrimination under the ADA or Section 504. Second, and as explained at length above, Plaintiff did not allege that Pennsbury ever exercised *any* control over Ms. Derolf during the school year, let alone during the timeframe following her arrest. For example, Plaintiff does not allege that Pennsbury officials ever communicated with Ms. Derolf, or otherwise had any authority to train, monitor, or exert any influence over VDS and its staff.[19] Finally, Plaintiff does not allege that Pennsbury could exercise any sort of control over the manner in which Ms. Derolf continued her harassment following her arrest. As noted above, Plaintiff did not allege that Ms. Derolf contacted him using district-issued equipment or that she met with him on or even near Pennsbury property. Instead, the Amended Complaint allegations reiterate that Ms. Derolf contacted him in secret, met with him off school property, and ultimately met with him on August 22, 2021 after the end of the ESY program.

In short, the Amended Complaint allegations do not state a plausible claim for relief under the ADA or Section 504 of the Rehabilitation Act. As such, these Counts are dismissed as well.

### D.      Further amendments to the Complaint would be inequitable.

Having concluded that all counts of the Amended Complaint are dismissed, the undersigned must decide whether Plaintiff should have an opportunity to file a Second Amended Complaint. The Third Circuit has instructed that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted).

The procedural history of this case, as set forth above in more detail, is straightforward. Plaintiff filed his lawsuit against two defendants—VDS and Pennsbury. *See* Doc. No. 1. In lieu of Answering the original Complaint, both defendants moved to dismiss the lawsuit in its entirety.

---

[19]      Nor does Plaintiff suggest that Pennsbury could have possibly exerted any control over Ms. Derolf following her arrest.

*See* Doc. Nos. 19, 20, 22, 23. Plaintiff did not file an amended complaint at that time to address Defendants' arguments concerning the deficient pleadings, and instead filed briefs in opposition to each motion. *See* Doc. Nos. 29, 30. Notwithstanding the pending motions to dismiss, the undersigned directed the Parties to engage in a six (6) month discovery period. *See* Doc. No. 27. Several months later, Plaintiff informed the Court that he had settled his claims against VDS and that he intended to file an Amended Complaint. *See* Doc. No. 49, 50, 50, 51. On July 17, 2025— i.e., 148 days into the 180-day discovery period—the Court granted Plaintiff's motion for leave to file an Amended Complaint. *See* Doc. No 54. However, despite having engaged in discovery over several months, and with the benefit of knowing Defendants' positions concerning the pleadings, Plaintiff did not substantively amend the allegations. *Compare* Doc. No. 1 *with* Doc. No. 55. Instead, he merely removed all counts against, and references to, the now-settled defendant, VDS. Finally, as of the writing of this Memorandum, the deadline to complete fact discovery has expired.

In short, after Plaintiff had already considered Defendants' challenges to his Complaint in the first round of briefing on the motions to dismiss, after the Parties have already engaged in a six-month discovery period, and after Plaintiff has already filed an Amended Complaint without having substantively changed *any* of the facts or legal theories of his claims, the Court finds that it would be inequitable to permit another round of amendments. *See Arthur v. Maersk, Inc*., 434 F.3d 196, 204 (3d Cir. 2006) ("When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied."); *see also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 655 (3d Cir.1998) (finding that the "substantial effort and expense of resolving defendants' Motion to Dismiss the First Amended Complaint ... support[ed] the district court's denial of leave to amend"), *abrogation on other grounds recognized by Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000). Moreover, to correct the pleading

errors identified above, it is clear that Plaintiff must set forth entirely new facts and new theories, thus requiring additional discovery, cost, and preparation on the part of Pennsbury. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) ("Specifically, we have considered whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories."). Nor is it clear to the undersigned what those new facts might be, because the events at issue in this lawsuit all took place more than four (4) years ago and Plaintiff has not suggested any intervening changes. *See  Cureton v. Nat'l Collegiate Athletic Ass'n*, No. CIV. A. 97-131, 2000 WL 388722, at *3 (E.D. Pa. Apr. 14, 2000), aff'd, 252 F.3d 267 (3d Cir. 2001) (explaining, in relevant part, that the interest in finality of the proceedings would be ignored if plaintiffs were permitted to amend after extensive discovery where the basis for the proposed amended pleading were already known for several years).

Given this, the Court holds that further amendments would be inequitable. Therefore, the Amended Complaint is dismissed with prejudice.[20]

---

[20]    The district court in *Goldfish Shipping, S.A. v. HSH Nordbank AG*, 623 F. Supp. 2d 635 (E.D. Pa. 2009), *aff'd*, 377 F. App'x 150 (3d Cir. 2010) addressed a similar situation. In that case, the court issued a memorandum opinion dismissing plaintiff's first amended complaint. Ten days later, plaintiff sought leave to file a second amended complaint. In doing so, the district court noted that plaintiff reframed its legal claims and asserted new legal theories in an "apparent attempt to circumvent the legal deficiencies identified" in the earlier opinion. *Id.* at 636. The court, however, denied plaintiff's motion explaining, in relevant part:

> [I]t is plain that [plaintiff] had prior opportunities to amend its complaint to state the very same claims it now includes in its proposed Second Amended Complaint. As detailed above, [plaintiff] filed its First Amended Complaint in May of 2008, after months of discovery had been undertaken. It does not argue that, since the drafting of the First Amended Complaint, it has obtained additional factual information, or that there has been a change in the law, that has permitted it to formulate new, more viable theories of recovery. Rather, it seems to argue that it simply did not think, earlier in the litigation, that it was necessary to advance its current theories of recovery or to allege the new facts that it sets forth, because it did not realize that the old theories were infirm or that the additional facts were important.

*Id.* at 640. The court explained further, "[u]nder these circumstances, [plaintiff] should not be permitted a 'do-over' to assert new legal theories and permutations of its prior claims that it could have asserted much earlier." *Id.* Indeed, "[i]f [plaintiff] had viable, alternative theories of recovery in this case, it was obligated to present those theories to the Court either in the First Amended Complaint or in response to [defendant's] Motion to Dismiss; it should not have withheld them while we invested considerable time and judicial resources evaluating what it now says was an incomplete set of theories, which emphasized the wrong facts, set forth the wrong sources of legal duties and, overall,

## IV.    CONCLUSION

For the foregoing reasons, Pennsbury's Motion to Dismiss, *see* Doc. No. 56, is **GRANTED** and the Amended Complaint, *see* Doc. No. 55, is dismissed with prejudice. An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge

---

charted the wrong course to the requested relief." *Id.* Allowing such an amendment would "subvert the very important interests in judicial economy and finality." *Id.*